1

2

3

4                         UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CHRISTOPHER R.,[1]                          Case No.  19-cv-03921-TSH

8                       Plaintiff,

9            v.                                  **ORDER RE: CROSS-MOTIONS FOR
                                                 SUMMARY JUDGMENT**
10   ANDREW SAUL,
                                                 Re: Dkt. Nos. 18, 24
11                     Defendant.

12

13                          **I.     INTRODUCTION**

14          Plaintiff Christopher R. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

15   review of a final decision of Defendant Andrew Saul, Commissioner of Social Security, denying

16   Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for

17   summary judgment.  ECF Nos. 18 (Pl.'s Mot.), 24 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-

18   5, the motions have been submitted without oral argument.  Having reviewed the parties'

19   positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby

20   **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REMANDS** for further

21   proceedings consistent with this Order.

22                          **II.    BACKGROUND**

23   **A.      Age, Education and Work Experience**

24          Plaintiff is 38 years old years old.  AR 144.  He has prior work experience as a

25   microcomputer support specialist, electrician, and furniture mover.  AR 47.

26

27   _____

     [1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
28   recommendation of the Committee on Court Administration and Case Management of the Judicial
     Conference of the United States.

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.     Medical Evidence**

In 2011, Plaintiff was laying electrical cable as a contractor in Afghanistan when he injured his back.  AR 268.  Notes from the Sharana Aid Station Clinic in Afghanistan from September 2011 reported that he had upper back pain that had lasted for over a week.  *Id.*  Plaintiff attempted physical therapy without improvement and was flown to a hospital.  AR 268, 275.  He was treated with a cervical manipulation that worsened his pain.  *Id.* (both).  Plaintiff stated that his pain was unrelenting and worsened with moving, lifting, bending, and raising his arms.  AR 268.  His pain was interfering with sleep and his work duties.  *Id.*

On examination, he had pain with extension, flexion, rotation, or twisting of his neck, reduced range of motion of up to a 50% decrease in flexion and side bending, and positive straight leg raise tests.  AR 269.  He also complained of lower back pain.  *Id.*  The evaluation revealed neck sprain/strain but no neurological deficits.  *Id.*  At that time, no physical therapy or other treatment was recommended, and he was instead advised to take anti-inflammatory medication such as Motrin or Advil and to rest off-duty for ten days, then resume light duty work assuming the absence of any additional findings.  *Id.*

By September 30, 2011, Plaintiff had returned to California and was provided with a referral to a spine clinic after presenting to an emergency room for neck pain.  AR 308-09.  On October 11, 2011, Chiropractor Brandon L. Roberts, D.C. advised him to remain off work until October 31 to avoid aggravating his condition.  AR 287.

A cervical spine MRI from October 26, 2011 showed straightening of the cervical spine with muscle spasm and/or strain and there was a left paracentral C6-7 disc protrusion effacing the left spinal cord, though without impingement.  AR 295.

On October 28, 2011, Paul Nottingham, M.D., performed an initial evaluation, during which Plaintiff advised him that his pain had improved and he hoped to return to work.  AR 321. During the course of his treatment, Dr. Nottingham instructed Plaintiff to remain off work for several periods of time from at least November 22, 2011 through March 1, 2014.  AR 371, 431, 443, 481, 484, 511, 529, 590-91.

Plaintiff continued physical therapy through 2011.  AR 316, 341.  In October 2011 he

2

1   reported "good relief" from chiropractic treatment, feeling "much better" despite residual neck

2   stiffness, and that he hoped to return to his usual work.  AR 321.  He also reported being able to

3   drive, turn his head at 90 degrees and perform activities of daily living without difficulty and pain.

4   *Id.*  On examination, he was largely normal and had "full cervical flexion and extension without

5   pain upon overpressure."  *Id.*  During a physical therapy evaluation on November 10, 2011,

6   Plaintiff's ranges of motion were "full" and his strength was 4-5/5 with no or only "mild" pain.

7   AR 316.

8         In January 2012 Plaintiff underwent a nerve conduction study that found mild to moderate

9   median nerve compromise from the wrist through the carpal tunnel on the left and mild median

10  nerve compromise on the right.  AR 545.  He presented "with no acute evidence of axonal

11  disruption."  *Id.*

12        On February 27, 2012, Kasra Amirdelfan, M.D. reviewed the October 26, 2011, MRI C-

13  Spine and diagnosed Plaintiff with brachial neuritis.  AR 298-99.  Dr. Amirdelfan recommended a

14  surgical referral if the pain was not well controlled with medication and injections.  AR 298.  On

15  March 13, 2012, Dr. Amirdelfan treated Plaintiff with a cervical epidural steroid injection for his

16  cervical radiculopathy.  AR 295-97.

17        In April and May 2012 Plaintiff continued physical therapy.  AR 333-36.  However, he

18  missed several sessions because of illness, transportation difficulties, and a misunderstanding

19  about whether he was to continue therapy, including that he was allegedly told he did not need to

20  finish treatment.  AR 333-36, 342.

21        Notes from an August 24, 2012 MRI indicate that the findings were not significantly

22  changed.  AR 435-36.  In particular, neural foramina were patent at C6-7, and there was "limited"

23  narrowing and "no stenosis" at other levels.  *Id.*

24        On September 12, 2012, Dr. Nottingham recommended surgical intervention.  AR 491.

25  One month later, Plaintiff underwent neck surgery, with a fusion at C6-7.  AR 461.  The surgery

26  was apparently complicated by delayed fusion and pseudo-arthritis, but Plaintiff ultimately

27  responded to additional time and bone stimulator treatment.  AR 347.

28        An October 19, 2012 MRI of Plaintiff's cervical spine revealed "new interval straightening

United States District Court
Northern District of California

3

of the cervical spine lordosis which may be secondary to muscle spasm," but described all other findings as stable (mild bulge and annular fissure, mild central stenosis without foraminal narrowing, and no bone edema or ligamentous injury).  AR 385-86.

On October 29, 2012, Plaintiff underwent an anterior C6-C7 discectomy with plate and screw fixation and a bone graft to repair left arm radiculopathy "without any difficulty."  AR 461-64.

A diagnostic study of Plaintiff's neck in March 2013 revealed no stenosis.  AR 423.

On September 14, 2013, Plaintiff went to the emergency room for leg pain.  AR 304. Patrice Ringo, M.D. diagnosed left leg pain but noted no abnormal findings and sent Plaintiff home.  AR 305-06.

On September 25, 2013, Plaintiff saw Adolfo Romero-Duran, M.D. for severe left ankle pain, after injuring it in the parking lot of his apartment.  AR 759-60.  Dr. Romero-Duran noted that Plaintiff had chronic low back pain and cervical neuropathy.  AR 760.

Plaintiff continued physical therapy in October 2013 for a left ankle sprain as well as cervical and scapular pain radiating through his left arm with numbness and tingling.  AR 326.  He reported only temporary relief after therapy and needing to take Norco during the day and Baclofen at night.  *Id.*  On examination the therapist found Plaintiff had reduced range of motion in his cervical spine (extension, rotation, and pain with lateral flexion).  *Id.*

In November 2013 Kevin C. Booth, M.D. completed an Independent Medical Evaluation in connection with Plaintiff's worker's compensation claim.  AR 736-38.  He opined that Plaintiff was not malingering and that he "is unable to return to work at this time without restrictions.  It is possible that he could perhaps do very sedentary work or even a desk job if his employer could accommodate this, but this seems unlikely" given his prior job as a network technician that "involved some fairly strenuous activities."  AR 738.  On December 3, 2013, Dr. Booth requested that the insurer cover a CT scan to determine if he had pseudo-arthritis and if he needed additional surgery.  AR 803-04.

On November 26, 2013, Dr. Nottingham found Plaintiff to be neurologically intact to the upper extremities and sent him back to physical therapy for his neck and left arm pain.  AR 372.

4

1    Plaintiff began seeing Susan Gutierrez, M.D., in February 2014.  AR 1159-62.  At his

2    initial visit, he complained of constant neck and back pain associated with headache, joint pain,

3    stiffness, and swelling, as well as muscle spasms.  AR 1159.  Dr. Gutierrez prescribed Norco for

4    pain.  AR 1161.

5    An April 2014 CT scan found the cervical fusion solidly incorporated, marked

6    straightening of the cervical lordosis seen with muscle spasm or cervical strain, multiple level

7    facet hypertrophy, and a small disc protrusion at C4-5 and C5-6 with mild central canal stenosis.

8    AR 367-68.  The radiologist reported that the fusion was "solid" and that there was no hardware

9    complication.  AR 365.  She noted that at C3-4, moderate foraminal stenosis was apparent, but

10   other findings were mild at most.  *Id.*

11   In May 2014 Plaintiff reported significantly reduced pain with medication, minimal side

12   effects, and improved function (able to perform light housekeeping and cooking and all hygienic

13   ADLs "consistently").  Dr. Gutierrez refilled his medications.  AR 1168-70.

14   In June 2014 Plaintiff was seen by Michelle Trumpler, PA-C at Dr. Gutierrez's office for

15   an emergency visit because of increased neck pain and headache.  AR 672-74.  On July 11 Dr.

16   Gutierrez treated him with a cervical facet medial branch block.  AR 670-71, 855.

17   On July 23, 2014, Dr. Booth completed an independent medical evaluation follow-up note.

18   AR 347-49.  Dr. Booth reported that Plaintiff appeared sincere and motivated to get back to work

19   but was slowly and progressively "weathered" by his injury.  AR 347.  On examination Dr. Booth

20   found his range of motion remained only 50% of normal and with "significant discomfort."  *Id.*

21   Dr. Booth's impression was of "persistent debilitating cervicalgia" and "possible myofascial pain

22   syndrome versus inflammatory muscle disorder."  AR 348.  Dr. Booth opined that Plaintiff was

23   not malingering.  *Id.*  Dr. Booth further noted that Plaintiff's "life is clearly disheveled, and he has

24   suffered substantially from his disability and industrial injury and the length of treatment, etc."  *Id.*

25   He recommended Plaintiff continue to receive pain management, he was not a candidate for

26   further surgery, and that he be evaluated for a rheumatological condition.  *Id.*

27   In August 2014 Plaintiff reported to Dr. Gutierrez "improved function and [being] able to

28   do more in and outside of the home such as basic household ADLs such as cooking, cleaning,

5

1   shopping etc. . . . with increased endurance and tolerance for such activities.  Dr. Gutierrez refilled

2   his medications.  AR 1178-81.

3          Dr. Gutierrez's treating notes from September 2014 to February 2015 confirmed Plaintiff's

4   favorable response to his medication regiment.  AR 661-62, 1185-86, 1190-97, 1201-04.  At a

5   visit with Dr. Gutierrez in September 2014, Plaintiff noted his pain at a 6/10 with medications and

6   a 10/10 without any medications.  AR 661.  In November 2014 he reported his pain was as high as

7   a 9/10, and that his medications reduced the pain to a 4/10.  AR 653.  In January 2015 he noted

8   that his pain was reduced only to a 7/10 with medications and was otherwise an 8.5/10.  AR 648.

9   In February 2015 he noted that his pain fluctuated depending on activity and that he had "good

10  days and bad days."  AR 641.  He also complained of muscle spasms and weakness.  *Id.*  With his

11  pain medications, he reported his pain at a 3/10 and without it as an 8/10.  AR 642.  He noted a

12  desire to return to normal activities and was encouraged to do so with "mindfulness to lifting

13  restrictions and body awareness."  *Id.*  In March 2015 Plaintiff reported that his medications

14  reduced his pain levels to a 4/10 instead of an 8/10 and made it easier for him to function, be more

15  emotionally stable, and sleep better. AR 629-30.  In April 2015 Plaintiff reported that he continued

16  to experience neck pain depending on the activity level and type of activity.  AR 625.  He reported

17  that he was able to perform household activities and function socially when his pain was better

18  controlled.  *Id.*  He noted only taking his pain medication when his pain was "really bad" and that

19  he had not taken one in a while.  AR 627.  Dr. Gutierrez recommended medial branch block

20  injections.  *Id.*

21         On February 3, 2015, Dr. Gutierrez reported in her treatment notes that she had a "long and

22  frank discussion" with Plaintiff, that his pain level was at 3/10 when compliant with his

23  medications, that his daily activities had increased, and that he was able to perform "household

24  and hygienic ADLs [daily activities]" "consistently because of the pain control he obtains from his

25  medications."  AR 1202, 1207-08.  Plaintiff reported wanting to take a helicopter course including

26  a flight with the instructor and go fishing, and Dr. Gutierrez encouraged him to return to his

27  normal activities.  AR 1202.  She referred him to an orthopedic specialist, Vikram Talwar, M.D.,

28  for further treatment.  AR 1209.

United States District Court
Northern District of California

United States District Court
Northern District of California

On March 25, 2015, Dr. Talwar evaluated Plaintiff and noted tenderness along the C6-7 and C2-3 levels of his neck, but all other findings were normal. AR 703. He noted Plaintiff had good strength and sensation in his arms and negative Spurling sign despite some tenderness in his neck and back. *Id.* In an April 23 report to Dr. Gutierrez, Dr. Talwar indicated that Plaintiff "has good strength and sensation in his bilateral upper extremities" despite a diagnosis of cervicalgia (cervical pain). AR 704.

On April 30, 2015, Dr. Gutierrez reduced the prescribed number of Norco tablets to 90 "for weaning purposes and noted that Plaintiff was still picking up his medication every month, even though he reported not having taken any of his medication in a few months and his toxicology tests were negative for Norco. AR 625-27.

Plaintiff reported to Dr. Gutierrez's office in June 2015 for increased pain levels. AR 622-24. Dr. Gutierrez found him unable to work for at least three months, although he opined he might be able to return to work after further conditioning. AR 623. Dr. Gutierrez listed his diagnoses as cervical pain, disc disorder, myalgia and myositis, and cervical facet syndrome. *Id.* She prescribed Baclofen and Colace. *Id.* Dr. Gutierrez further explained that: "I AM UNCLEAR ABOUT THE STATIJS OF HIS CLAIM AND HE IS VERY VAGUE. HE IS DEEMED DISABLED FOR THE NEXT 3 MONTHS. HOWEVER HE IS INSTRUCTED TO EXERCISE AND RECONDITION HIMSELF DURING THAT TIME. AT THE END OF 3 MONTHS, THE PATIENT SHOULD LIKELY BE ABLE TO RETURN TO GAINFUL EMPLOYMENT." *Id.* (emphasis in original).

In September 2015 Plaintiff reported to Dr. Gutierrez's office with increased pain, which was at a 6/10 pain level with medications. AR 661.

Plaintiff saw Dr. Romero-Duran in November 2015 to evaluate his chronic neck pain with decreased range of motion. AR 765-66. In January 2016 Plaintiff complained of heart palpitations associated with anxiety attacks and depression, as well as continued neck pain and obstructive sleep apnea. AR 769. He reported the next month that his anxiety and depression had improved with medication. AR 784.

In February 2016 Plaintiff returned to physical therapy. AR 776. He reported his neck

1    pain worsens with driving, cervical rotation is painful and limited, and that he has difficulty either

2    reaching overhead or down to the floor. *Id.* He also reported that even mildly strenuous activity

3    could cause pain, but it was sometimes relieved by lying flat on the ground. *Id.* The therapist

4    observed he had a "slightly kyphotic, decreased cervical extensibility." AR 777. His range of

5    motion was severely limited in both his spine and shoulder as well as having instability in his

6    cervical spine on objective testing. AR 777-78. At another therapy session later that month, the

7    therapist noted Plaintiff was having difficulty achieving his goals because of co-morbidities, and

8    that he had significantly limited cervical range of motion. AR 787.

9         Dr. Romero-Duran saw Plaintiff in July 2016 for complaints of difficulty focusing,

10   concentrating and retaining new information. AR 792. Plaintiff reported that his companion

11   animal was helping him cope better with stress and anxiety. *Id.* Dr. Romero-Duran noted that

12   Plaintiff took "norco for chronic neck pain which help him," but did not find any anomalies on

13   physical examination. AR 792-93.

14        In December 2016 and March 2017, Dr. Romero-Duran found Plaintiff's neck to be

15   supple, without anomalies. AR 1237, 1239-40. In progress notes for a visit in May 2017, Dr.

16   Romero-Duran noted that Plaintiff had an emergency room visit in January 2017 for back pain.

17   AR 1243. He found that Plaintiff had only "mild" musculoskeletal issues despite chronic neck

18   pain. *Id.* In a note written one week later, Constantin Nicholas, M.D. reported that Plaintiff had

19   full range of motion and that Plaintiff stated he had no pain. AR 1245.

20        In October 2017, at Dr. Romero-Duran's request, Gabriel De Faria, PT, DPT, performed a

21   physical examination, finding that Plaintiff had good strength, limited range of motion, and

22   significant limitations due to his complaints of pain with various activities. AR 1301. During the

23   assessment, Dr. De Faria noted that Plaintiff complained of neck and back pain, and that his "back

24   has gotten worse due to not working out." AR 1301-02. Based on his examination and Plaintiff's

25   symptom reports, Dr. De Faria noted that heavy lifting, carrying, pushing, pulling or prolonged

26   standing increased Plaintiff's pain and that "[he] may benefit from a sedentary occupation." AR

27   1301.

28        In a questionnaire completed for the agency on November 1, 2017, Dr. Romero-Duran

United States District Court
Northern District of California

8

stated that Plaintiff was being treated for cervical neuropathic pain, chronic neck pain status post-surgery, and chronic back pain.  AR 1315.  He stated that Plaintiff's symptoms and treatment would interfere with his work-related abilities for approximately 20 percent of the day.  *Id.*  He opined that Plaintiff should stand and walk for less than two hours in an eight-hour workday but would be unrestricted in sitting.  AR 1316.  He opined that Plaintiff would be restricted from using his upper extremities for more than two and a half hours in an eight-hour day and would be restricted to rotating or flexing his neck for more than two and a half hours in a day.  AR 1316-17.  Dr. Romero-Duran opined that Plaintiff would miss about one day a month of work due to his symptoms.  AR 1317.  He stated that Plaintiff would "benefit from a sedentary occupation that does not require heavy lifting, carrying, pushing, pulling or prolonged standing."  AR 1318.

In October 2017 Dr. De Faria assessed cervical radiculopathy with low back pain and that Plaintiff was limited in his functional capacity.  AR 1301.  Dr. De Faria noted that Plaintiff's pain increased with lifting or carrying over ten pounds and standing for more than approximately five minutes.  *Id.*  Dr. De Faria also noted that Plaintiff had minimal neck and pelvic motion and a stiff gait.  AR 1304.  He was unable to balance for more than 11 seconds (normal is 20), needed to use his arms to help support a kneel, and had significantly increased pain with lifting ten pounds.  AR 1308.  While Plaintiff could sit for 30 minutes, he had to constantly change positions.  *Id.*  In ambulating 1,368 feet, Plaintiff needed to take four breaks, walked with minimal movement of his neck even on turns, and complained of a tension headache with his neck bothering him.  AR 1309.  The three-hour evaluation caused a significant increase in his neck pain lasting through to the next day.  AR 1310.

On May 9, 2016, State agency reviewer Jeanine Kwun, M.D., found insufficient evidence at the initial level to make a determination, but she found that Plaintiff's spinal disorders were severe.  AR 60.

On August 23, 2016, State agency reviewer E. Cooper, M.D., found at the reconsideration level that Plaintiff could perform medium level exertional work, including lifting up to 50 pounds occasionally and unlimited balancing, stooping, kneeling, and crouching.  AR 74.  He limited Plaintiff from any "abruptive neck movement."  *Id.*

### III.   SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On March 25, 2016, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on August 24, 2011.  AR 143-50.  On May 10, 2016, the agency denied Plaintiff's claim, finding he did not qualify for disability benefits.  AR 79-82.  Plaintiff subsequently filed a request for reconsideration, which was denied on September 22, 2016.  AR 86-92.  On October 10, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 93.  ALJ David LaBarre conducted a hearing on November 8, 2017.  AR 30-55.  Plaintiff testified in person at the hearing and was represented by counsel, Eric Patrick.  The ALJ also heard testimony from Vocational Expert Gregory Jones.

**A.      Plaintiff's Testimony**

Plaintiff testified that he last worked in August 2011 and could no longer work because of physical limitations involving the neck, his range of motion, pain and pressure in his back and neck.  AR 35-36.  He described his impairments as resulting from an injury that "hurt immensely," causing him to go "stiff for about 7 to 10 days with literally no movement," after which he was diagnosed with a herniated disk which was repaired surgically.  AR 35.  He stated he could not stand or sit for long, is limited in rotating his neck or looking upwards, can only look down at a keyboard for less than ten minutes, gets radiation down his right arm that makes his fingers numb, and had limited sleep because of the pain.  AR 35-38.  Plaintiff spent approximately 40 to 60 percent of the day reclining and was constantly changing positions.  AR 39.  His wife did the household chores.  AR 40.

When asked about medical reports documenting the effectiveness of his medications, including increased function and the ability to perform daily living activities such as cooking and cleaning, Plaintiff testified: "Maybe I was able to bang out a couple dishes, things like that."  AR 42.  He stated that although he reported increased pain control to Dr. Gutierrez with his medications, it was because he was going from "nothing to anything," but it "wasn't anything extravagant."  *Id.*  Plaintiff stopped taking Norco because he did not like how it made him feel mentally.  AR 43-44.

Plaintiff testified he was able to drive but not for "very long distances," typically not more

United States District Court
Northern District of California

1  than 15 minutes.  AR 53-54.  To manage neck movement when driving, he would "usually go with

2  my whole body if I have to go to the right.  I use my mirrors a lot."  AR 53.

3        When the ALJ noted that the record indicated Plaintiff had been trying to find a new job in

4  July 2016, Plaintiff stated he did not believe he ever stated he was looking for a new job.  AR 45,

5  1235.  The ALJ also asked Plaintiff about the spinal fusion surgery, noting that Dr. Nicholas in a

6  May 2017 progress report indicated "he has had no problems with that."  AR 45, 1246.  Plaintiff

7  responded he assumed when Dr. Nicholas wrote that he had no problems he was referring to the

8  surgery having appeared to be successful in fusing the discs.  AR 45-46.  He later testified that he

9  only drives short distances and must turn his whole body to look at the mirrors.  AR 54.

10  **B.    Vocational Expert's Testimony**

11        The vocational expert testified that Plaintiff's past work was as an electrician (DOT[2] code

12  824.261-010), furniture mover (DOT 904.687-010) and Microcomputer Support Specialist (DOT

13  039.264-010).  AR 47.  The ALJ then asked the expert a series of hypotheticals.  In the first, the

14  ALJ asked him to

15        assume a hypothetical person of the Claimant's age, education and
16        work experience who is able to perform medium exertion work
        activities as it is defined in the regulations[3] with the following specific
17        limitations.

18        The individual is able to occasionally lift and carry 50 pounds,
        frequently lifting 25 pounds, sit, stand and walk six hours in an eight-
19        hour workday with normal breaks.   The individual is able to
        frequently climb ramps and stairs, occasionally climb ladders, ropes
20        or scaffolds, frequently kneel, crouch and crawl and will be absent
        one day per month.

21  AR 48-49.  When asked if the hypothetical individual could perform any of Plaintiff's past

22

23  ─────────────────

24  [2] The Dictionary of Occupational Titles ("DOT") by the United States Department of Labor,
   Employment & Training Administration, may be relied upon "in evaluating whether the claimant
25  is able to perform work in the national economy."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th
   Cir. 1990).  The DOT classifies jobs by their exertional and skill requirements and may be a
26  primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).  The
   "best source for how a job is generally performed is usually the Dictionary of Occupational
27  Titles."  *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).
   [3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
28  carrying of objects weighing 25 pounds.  If someone can do medium work, we determine
   that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).

relevant work, the expert responded yes as to the microcomputer support specialist and the electrician.  AR 49.

Next, the ALJ asked the vocational expert to

> assume a hypothetical person of the Claimant's age, education and work experience who is able to perform light exertion work activities as it is defined in the regulations[4] with the following specific limitations.
>
> The individual is able to frequently lift and carry 10 pounds, occasionally lift and carry 10 pounds, sit for up to six hours in a normal eight-hour workday with normal breaks, stand or walk six hours in an eight-hour workday, one hour at a time, with normal breaks.
>
> The individual can occasionally climb ladders, ropes or scaffolds, frequently climb ramps and stairs, frequently stoop, kneel, crouch and occasionally craw[l] and frequently reach bilaterally.  The individual would be absent one day per month.

*Id.*  When asked if the hypothetical individual could perform any of Plaintiff's past relevant work, the expert responded no.  *Id.*  The ALJ then asked if the individual could perform any other work, to which the expert responded yes and provided three examples: (1) general cashier, DOT 211.462-010; (2) routing clerk, DOT 222.687-022; and (3) information clerk, DOT 237.367-018.  AR 50.

The ALJ then asked the vocational expert to

> [a]ssume a hypothetical person of the Claimant's age, education and work experience who is able to perform sedentary exertion work activities as it is defined in the regulations[5] with the following specific limitations.
>
> The individual is able to frequently lift and carry 5 pounds,

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 416.967(b).

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 416.967(a).

> occasionally lift and carry 10 pounds, sit for six hours in an eight-hour workday, stand or walk two hours in an eight-hour workday with normal breaks.
>
> The individual can never climb ladders, ropes or scaffolds. The individual can frequently climb ramps and stairs, frequently stoop, kneel, crouch and occasionally crawl. The individual can perform frequent reach bilaterally. And the individual will be absent one day per month.

AR 51. When asked if the hypothetical individual could perform any of Plaintiff's past relevant work, the expert responded no. *Id.* The ALJ then asked if the individual could perform any other work, to which the expert responded yes and provided three examples: (1) telephone information clerk, DOT 237.367-049; (2) charge account clerk, DOT 205.367-014; and (3) bench hand, DOT 700.687-062. *Id.*

Finally, the ALJ asked "if we were to add to any of the hypotheticals an individual would be off task approximately 20 percent of the day from pain and functional limitations would that preclude his past work or any other work?" AR 53. The vocational expert responded yes. *Id.*

In response to questions from Plaintiff's attorney, the vocational expert testified that if an individual were restricted to rotation and flexion of the neck and use of the upper extremities for less than 2.5 hours a day, they would be precluded from work. AR 52-53. He later testified that a restriction to less than 2.5 hours during the day of capacity to flex the neck forward or rotate side to side would also preclude the occupations he had identified. AR 54-55.

## C.  ALJ's Decision and Plaintiff's Appeal

On May 2, 2018, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. AR 15-24. This decision became final when the Appeals Council declined to review it on May 9, 2019. AR 1-3. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On January 17, 2020, Plaintiff filed the present Motion for Summary Judgment. On March 26, 2020, Defendant filed a Cross-Motion for Summary Judgment.

## IV.  STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). An ALJ's decision to deny benefits must be set aside only when it is "based on

13

legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted).  It requires "more than a mere scintilla" but "less than a preponderance" of the evidence.  *Id.*; *Trevizo*, 871 F.3d at 674.

The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Trevizo*, 871 F.3d at 675 (citation and quotation marks omitted).  However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Id.* (citation and quotation marks omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation and quotation marks omitted).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (citation and quotation marks omitted).  A court may not reverse an ALJ's decision because of a harmless error.  *Id.* at 1111 (citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* (citation and quotation marks omitted).

## V.   DISCUSSION

### A.   Framework for Determining Whether a Claimant Is Disabled

A claimant is considered "disabled" [6] under the Social Security Act if two requirements are met.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  First, the

---

[6] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

*United States District Court*
*Northern District of California*

claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be severe enough that the claimant is unable to perform previous work and cannot, based on age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R. § 404.1520.  The claimant bears the burden of proof at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citation omitted).

At step one, the ALJ must determine if the claimant is presently engaged in a "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), defined as "'work done for pay or profit that involves significant mental or physical activities.'"  *Ford*, 950 F.3d at 1148 (internal quotations and citation omitted).  Here, the ALJ determined Plaintiff had not performed substantial gainful activity from his alleged onset date of August 24, 2011 through his date last insured of March 31, 2015.  AR 17.

At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), "meaning that it significantly limits the claimant's 'physical or mental ability to do basic work activities.'"  *Ford*, 950 F.3d at 1148 (quoting 20 C.F.R. § 404.1522(a)).  If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe impairments: myalgia, myositis, cervical facet syndrome cervicalgia, and post cervical laminectomy syndrome.  AR 17.

At step three, the ALJ evaluates whether the claimant has an impairment or combination of impairments that meets or equals an impairment in the "Listing of Impairments" (referred to as the "listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1.  The listings describe impairments that are considered "to be severe enough to prevent an individual from doing

1    any gainful activity." *Id.* § 404.1525(a).  Each impairment is described in terms of "the objective

2    medical and other findings needed to satisfy the criteria of that listing." *Id.* § 404.1525(c)(3).

3    "For a claimant to show that his impairment matches a listing, it must meet all of the specified

4    medical criteria.  An impairment that manifests only some of those criteria, no matter how

5    severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted).  If a

6    claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent

7    to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering

8    age, education and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined Plaintiff

9    did not have an impairment or combination of impairments that meets the listings.  AR 18.

10       If the claimant does not meet or equal a listing, the ALJ proceeds to step four and assesses

11   the claimant's residual functional capacity ("RFC"), defined as the most the claimant can still do

12   despite their imitations (20 C.F.R. § 404.1545(a)(1)), and determines whether they are able to

13   perform past relevant work, defined as "work that [the claimant has] done within the past 15 years,

14   that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do

15   it." 20 C.F.R. § 404.1560(b)(1).  If the ALJ determines, based on the RFC, that the claimant can

16   perform past relevant work, the claimant is not disabled. *Id.* § 404.1520(f).  Here, the ALJ

17   determined Plaintiff has the RFC to

18              perform sedentary work as defined in 20 CFR 404.1567(a) except that
             he is able to frequently lift and carry 5 pounds, occasionally lift and
19           carry 10 pounds; sit for up to 6 hours, stand or walk 2 hours in an 8-
             hour workday with normal breaks; never climb ladders, ropes or
20           scaffolds; frequently climb ramps and stairs; frequently stoop, kneel,
             crouch and occasionally crawl; frequently reach bilaterally; and
21           would be absent 1 day per month.

22   AR 18.  Based on this RFC, the ALJ determined Plaintiff could perform past relevant work.  AR

23   22.

24       At step five, the burden shifts to the agency to prove that "'the claimant can perform a

25   significant number of other jobs in the national economy.'" *Ford*, 950 F.3d at 1149 (quoting

26   *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).  To meet this burden, the ALJ may rely on

27

28

                                                    16

the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,[7] or on the

testimony of a vocational expert.  *Ford*, 950 F.3d at 1149 (citation omitted).  "[A] vocational

expert or specialist may offer expert opinion testimony in response to a hypothetical question

about whether a person with the physical and mental limitations imposed by the claimant's

medical impairment(s) can meet the demands of the claimant's previous work, either as the

claimant actually performed it or as generally performed in the national economy."  20 C.F.R. §

404.1560(b)(2).  An ALJ may also use "other resources, such as the DOT.  *Id.*  Here, the ALJ

determined Plaintiff could perform the requirements of representative occupations such as

telephone information clerk, charge account clerk, and bench hand.  AR 24.

**B.      Plaintiff's Arguments**

Plaintiff raises three arguments: (1) the ALJ erred in his evaluation of the medical

opinions; (2) the ALJ erred in evaluating his subjective complaints; and (3) substantial evidence

did not support the assigned RFC.

**C.      Medical Opinions**

In his decision, the ALJ accorded partial weight to the August 2016 of Dr. Cooper, the

physician employed by the State Disability Determination Services, who opined that Plaintiff

could frequently lift and carry 25 pounds and occasionally lift and carry 50 pounds; sit, stand and

walk six hours in an eight-hour workday; occasionally climb ladders, ropes and scaffolds; and

occasionally crawl.  AR 21, 64-77.  However, he rejected the October 27, 2017 opinion of

physical therapist Dr. De Faria, finding it was "well after the date last insured and that is not

helpful in making a determination as to whether [Plaintiff] was disabled prior to the date last

ensured."  AR 21.  The ALJ also rejected the November 1, 2017 opinion of Dr. Romero-Duran

because "it fails to address limitations from the alleged onset date to the date last insured" and "it

---

[7] The Medical-Vocational Guidelines "relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."  *Heckler v. Campbell*, 461 U.S. 458, 461 (1983).  The Guidelines "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy."  *Id.* at 461-62 (footnotes omitted). The guidelines are commonly known as "the grids".  *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

United States District Court
Northern District of California

appears that the proposed limitations are based in large part" on Faria's October 2017 evaluation. AR 22.

Plaintiff argues the ALJ "rejected every medical opinion in the record, favoring his own opinion instead." Pl.'s Mot. at 6. Specifically, he argues the ALJ (1) failed to provide legitimate reasons for rejecting all of the favorable portions of the opinions of Dr. Cooper, Dr. Romero-Duran, Dr. Booth, and Dr. Gutierrez; (2) erred in not considering Dr. Romero-Duran's November 2017 evaluation because Dr. Romero-Duran began treating him prior to his date last insured and specified in his evaluations that Plaintiff suffered from his limitations prior to March 2015; (3) the ALJ failed to give a specific and legitimate reason to discredit Dr. Booth; and (4) the only analysis of Dr. Gutierrez's opinion was that of an April 2015 report, but that report was prepared by Dr. Talwar. *Id.* at 6-8.

In response, Defendant argue the Court should uphold the ALJ's resolution of the conflicts in the medical opinions in light of the probative medical evidence relevant to Plaintiff's insured period. Def.'s Mot. at 3.

### 1.   Legal Standard[8]

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b). In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion. 20 C.F.R. § 416.927(c)(3). Generally, more weight will be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a whole. 20 C.F.R. § 416.927(c)(3)-(4).

In conjunction with the relevant regulations, the Ninth Circuit "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*,

---

[8] Rules regarding the evaluation of medical opinion evidence were recently updated, but the updates were made effective only for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844 (Jan. 18, 2017). As Plaintiff's claim was filed before 2017, the Court evaluates the medical opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p.

United States District Court
Northern District of California

528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(c)(2)).

If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(c)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See Orn*, 495 F.3d at 632

1    (citing SSR 96–2p,[9] 1996 WL 374188 (July 2, 1996)).  "In many cases, a treating source's medical

2    opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

3    test for controlling weight."  SSR 96-2p at 4.

4         Where an examining doctor's opinion is contradicted by another opinion, an ALJ may

5    reject it by providing specific and legitimate reasons that are supported by substantial evidence.

6    *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

7         **2.    Analysis**

8         As a preliminary matter, it is uncontested that Plaintiff last met the insured status

9    requirements of the Social Security Act on March 31, 2015, *see* AR 17, yet much of the medical

10   opinion evidence of record is after that date.  Disabilities must exist before the "date last insured"

11   to establish entitlement to disability insurance benefits.  *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir.

12   2008).  Thus, an ALJ may properly consider the remoteness of a medical evaluation in weighing a

13   medical opinion.  *See, e.g., Lombardo v. Schweiker*, 749 F.2d 565, 567 (9th Cir. 1984) (holding

14   that it was appropriate for the ALJ to discount an opinion rendered a year and a half after the date

15   last insured).  However, medical evaluations made after the expiration of a claimant's insured

16   status should not be disregarded solely on the basis that they are rendered retrospectively.  *Smith v.*

17   *Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988).  "'[M]edical evaluations made after the expiration of

18   a claimant's insured status are relevant to an evaluation of the preexpiration condition.'"  *Lester*,

19   81 F.3d at 832 (quoting *Smith*, 849 F.2d at 1225).

20        Here, the record indicates that Dr. Romero-Duran began treating Plaintiff as early as

21   September 25, 2013, almost two years prior to his date last insured, and noted at that time that he

22   had chronic low back pain and cervical neuropathy.  AR 759-60.  His evaluation on November 1,

23   2017 specified that he found Plaintiff to have suffered from his limitations prior to March 2015.

24   AR 1318.  He opined that Plaintiff was limited to flexing and rotating his neck for less than two

25

26   _____

27   [9] "[Social Security Rulings] do not carry the force of law, but they are binding on ALJs
     nonetheless."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20
     C.F.R. § 402.35(b)(1).  The Ninth Circuit defers to the rulings unless they are "plainly erroneous

28   or inconsistent with the Act or regulations."  *Chavez v. Dep't. of Health and Human Serv.*, 103
     F.3d 849, 851 (9th Cir. 1996).

United States District Court
Northern District of California

1    and a half hours a day, his symptoms and medications would interfere with his work

2    approximately twenty percent of the day.  AR 1315, 1317.  Because Plaintiff's treatment with Dr.

3    Romero-Duran refers to the same chronic condition and symptoms discussed before Plaintiff's

4    date last insured, the Court finds the ALJ improperly rejected his opinion based solely on timing.

5    *See Svaldi v. Berryhill*, 720 F. App'x 342, 344 (9th Cir. 2017) ("[T]he fact that those opinions

6    were issued significantly after Svaldi's [date last insured] does not undercut the weight those

7    opinions are due.") (citing *Garrison*, 759 F.3d at 1017 n.22); *see also Lester*, 81 F.3d at 832

8    ("'[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an

9    evaluation of the preexpiration condition.'") (quoting *Smith*, 849 F.2d at 1225).  There is nothing

10   in the evaluation to suggest that Dr. Romero-Duran was not basing these opinions on his own

11   review of the medical records, personal observations and examinations of Plaintiff.  Thus, remand

12   is appropriate for proper consideration of Dr. Romero-Duran's opinion.  *See Benecke v. Barnhart*,

13   379 F.3d 587, 595 (9th Cir. 2004) (Generally, when the Court reverses an ALJ's decision, "the

14   proper course, except in rare circumstances, is to remand to the agency for additional investigation

15   or explanation.")

16        As to Dr. Booth, he also treated Plaintiff prior to his date last insured.  AR 736-38.  Dr.

17   Booth opined that Plaintiff was not malingering and that he would be unable to perform anything

18   other than a desk job, and that was only if he could be accommodated.  *Id.*  Dr. Booth found that

19   Plaintiff's range of motion of his neck was only 50% of normal, and that cervical motion caused

20   "significant discomfort."  AR 347.  Dr. Booth opined that Plaintiff had "persistent debilitating

21   cervicalgia."  AR 348.  The only reason given as to why the ALJ declared "I am not considering

22   this opinion" was because Dr. Booth was not forming his opinion with "regard to the Social

23   Security Administration's disability program."  AR 22.  This was not a specific and legitimate

24   reason to discredit Dr. Booth's opinion because "the ALJ may not disregard a physician's medical

25   opinion simply because it was initially elicited in a state workers' compensation proceeding, or

26   because it is couched in the terminology used in such proceedings."  *Booth v. Barnhart*, 181 F.

27   Supp. 2d 1099, 1105 (C.D. Cal. 2002) (citing *Coria v. Heckler*, 750 F.2d 245, 247-48 (3d Cir.

28   1984) (holding that by failing to consider medical reports submitted in state workers'

compensation proceeding the ALJ failed to weigh all of the evidence of record)); *see also Lester*, 81 F.3d at 832 (holding that the ALJ erred in rejecting a physician's reports because they "were clearly obtained by the claimant's attorney for the purpose of litigation," and stating that "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them"). Instead, the ALJ should "'translate' terms of art contained in such medical opinions into the corresponding Social Security terminology in order to accurately assess the implications of those opinions for the Social Security disability determination." *Booth*, 181 F. Supp. 2d at 1106; *Gonzalez v. Comm'r of SSA*, 2018 WL 1426655, at *7 (N.D. Cal. Mar. 22, 2018) ("Simply because medical evidence was derived from a worker's compensation proceeding does not mean the ALJ is not required to review that medical evidence and explain why such evidence should be afforded particular weight."); *Heun-Davidson v. Berryhill*, 2017 WL 5054657, at *6 (C.D. Cal. Nov. 1, 2017) ("An ALJ may not disregard a medical opinion simply because it was initially elicited in a state workers' compensation proceeding. Instead, an ALJ must evaluate the medical records prepared in the context of workers' compensation in the same way he would evaluate records obtained otherwise") (internal quotation and modifications omitted). Because it is not clear that the ALJ adequately "translated" Dr. Booth's opinion into Social Security terms, and because it is not clear that he analyzed his opinion in light of the relevant factors, remand is appropriate. *See Benecke*, 379 F.3d at 595.

Finally, Dr. Gutierrez also began treating Plaintiff prior to his date last insured. AR 685. As part of his decision, the ALJ noted that "Dr. Gutierrez's April 23, 2015 report (a few weeks after the claimant' March 31, 2015 date last insured) indicated that the claimant had good strength and sensation in his bilateral upper extremities" and that "[s]he diagnosed cervicalgia, i.e. cervical pain." AR 21 (citing AR 704). As discussed above, medical evaluations made after the expiration of Plaintiff's insured status should not be disregarded solely on the basis that they are rendered retrospectively. Regardless, the report cited by the ALJ was not from Dr. Gutierrez; it was prepared by Dr. Talwar, who deferred to Dr. Gutierrez for her opinion on Plaintiff's work status and restrictions. AR 704-05. Dr. Talwar did note good strength and sensation, but otherwise provided no details at all about his examination. AR 704. As such, it is not clear that the ALJ

22

provided specific and legitimate reasons for discrediting Dr. Gutierrez's findings and opinions. Remand is appropriate.  *See Benecke*, 379 F.3d at 595.

**D.      Plaintiff's Remaining Arguments**

Because remand is appropriate, the Court does not consider Plaintiff's remaining arguments.  However, the Agency should take them into account as part of its reconsideration.

**VI.    CONCLUSION**

For the reasons set forth above, the Court **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross motion, and **REMANDS** for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: July 17, 2020

THOMAS S. HIXSON
United States Magistrate Judge